## Staiar's Administrator, et al. v. Netter.

*(Decided April 27, 1923.)*

### Appeal from Owen Circuit Court.

1. Executors and Administrators—Evidence Held to Support Verdict Finding Contract to Give Plaintiff Property and a Living for Services.—Evidence held to support a verdict finding a contract between plaintiff and deceased, whereby deceased agreed that, if plaintiff would care for deceased and his wife during their lives, deceased would give him a house and lot and sufficient money to keep him for the rest of his life, in addition to the monthly sum which he was paid for his services.

2. Executors and Administrators—Evidence Held not Definite Enough to Take to the Jury Issue of Contract to Give Plaintiff House and Lot.—Evidence in support of a claim against decedent's estate for breach of a contract by decedent to give plaintiff a house and lot for services to decedent and his wife held not definite and certain enough as to the identity or the value of the house and lot to be given to warrant the jury in allowing recovery for the breach of that promise.

3. Damages—Measure of Recovery for Breach of Contract to Furnish Living to Plaintiff for Services Stated.—Where plaintiff established a contract with decedent to give him, in addition to his pay, a living for the rest of his life in return for services rendered to decedent and his wife, the proper measure of recovery was not the value of the services rendered, but a sum which would be reasonably sufficient to maintain him in his existing situation in life for the balance of his life, reckoned according to the recognized tables of mortality, which is a sum that can be ascertained by the jury.

J. G. VALLANDINGHAM, CONRAD H. SYME and S. D. ROUSE for appellants.

CAMMACK & BAKER and H. C. FAULKNER for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE SAMPSON—
Reversing.

In January, 1918, Tobias W. Staiar died testate survived by Kate Rousseau, his only child. She lived in Washington city. Her father had given up his home in Owenton, Kentucky, in December, 1917, and had gone to Washington to make his home with his daughter. He was then a very old man. At the time of his death he was 102 years of age. Only a short time before Staiar's death his wife, who was much younger than he though quite an old lady, died at their home in Owenton. This home consisted of about 53 acres of land in the suburbs of the county seat, and in addition to the mansion house there was on it at least one other residence. In this tenant house lived appellee Manlius Netter, a negro, who acted as the body servant, coachman, gardener and man of all work to both Staiar and his wife from some time prior to 1902 up to the time of their deaths. For his services he received $18.00 per month up to June 1, 1911, and $20.00 per month thereafter, except that Staiar for some unexplainable reason did not pay him for the month of February in each year. For each payment for services Staiar took a receipt from Netter.

After the death of Staiar and the appointment of his administrator a suit was commenced for the settlement of the Staiar estate. While this action was pending appellee Netter interpleaded, setting forth that the estate of Staiar was indebted to him in the sum of $3,500.00 for services performed by him to the deceased Staiar and his wife, under an express contract whereby he was to work for, wait on and serve both Staiar and his wife from the time of the making of the agreement, several years before the death of Staiar, until their death, for which Staiar agreed and promised to pay him in addition to the monthly stipend set out above, a house and lot and a sufficient sum of money to keep Manlius in reasonable comfort the balance of his days; that in pursuance to said contract appellee did remain with and serve both Staiar and his wife until she died and continued until Staiar died, but that Staiar had violated his contract and agreement by failing to will or deed him the house and lot, or to give him or provide for him having a sufficient sum in money to support and take care of appellee the balance of his life; that during his attendance upon Staiar and wife, appellee performed divers and sundry services

of a personal nature, some of which were extremely unpleasant and difficult and others obnoxious and disagreeable, especially when the said Staiars were sick and unable to take care of themselves; that Mrs. Staiar was for some months before her death afflicted with cancer, which rendered her unable to take care of herself and which gave off very offensive, nauseating odors and rendered appellee's duty very burdensome and disagreeable; that the services performed to Staiar while he was sick and afflicted with bowel and kidney trouble, were nauseating and extremely unpleasant; that he performed these services, relying upon the agreement and promise of the said Staiar to give him a house and lot and a sufficient sum of money to take care of him the balance of his days and that but for said contract he would not have remained with Staiar but would have accepted employment elsewhere as he had the opportunity to do at much better wages some years previous to the death of Staiar.

The administrator denied the averments of the petition insofar as the express contract relied upon in the petition is concerned, and pleaded that the appellee received in full his wages each month and the said wages, receipts for which were produced, were in full of all services up to the time of the payment of the same which precluded the idea of an express contract such as appellee Netter asserted. Issue being joined appellee Netter, plaintiff below, called several persons as witnesses to prove the express contract alleged in his petition. By these witnesses he established in a more or less definite way that Staiar had promised and agreed with appellee Netter to give him by will or deed a house and lot and a sufficient sum of money to support him the balance of his life. Most of these witnesses were servants about the Staiar premises and heard conversations between Staiar and his man Netter concerning the employment and wages and other compensation which he was to have. He proved that some years before the death of Staiar appellee, finding the burdens of his position increasing with the age and feebleness of his employer, decided to quit the employment of Staiar and to take employment elsewhere. When this came to the ears of Staiar and his wife they besought Netter to remain with them and to continue to serve them and they told appellee they could not do without him and if he would change his mind and continue with them and to serve them that Staiar would not only pay him the same wages he was then paying him—$20.00

per month—but would in addition give Manlius a house and lot and a sum of money sufficient to take care of him the balance of his life; that Manlius accepted this proposition from Staiar and agreed to remain with Staiar and to serve him until the end of the life of Staiar and his wife, and that he did so, but that Staiar did not make provision for Manlius by will or deed as he agreed to do. One of the witnesses went so far as to state the house and lot contemplated by the parties was the one in which Manlius lived, near the residence of his employer, Staiar. However this evidence is rather vague and uncertain. One of the witnesses, Mildred Taylor, testified in part as follows:

"Q. In the years before that, had you heard any talk between Manlius Netter and T. W. Staiar and between Manlius and T. W. Staiar and his wife together, about any arrangement they had about his wages? Tell me yes or no. A. I have. Q. Did you hear them more than once? A. Yes, I have. Q. How often? A. Well, it would come up very often. . . . Q. Tell the jury what you heard them say the first time, if you can distinguish the first time what they said, or the substance of all that was said? A. Uncle Manlius wanted to leave, and they didn't want him to. He didn't think he was getting wages enough. He talked to me about it and I didn't think he was either. Q. Tell what they said to him and what they agreed upon, if they did agree on anything? A. He was talking to me before he talked to Manlius. Q. Was Mr. Staiar talking to you before he talked to Manlius? A. Yes, sir; he told Manlius he wanted him to stay, didn't want him to leave, said he had things fixed for him and money to take care of him. Have heard him say that dozens of times. ` Q. What did Manlius say? A. He said that is all right "boss," if it is that way. I am expecting you to take care of me. Q. How far back in your services was the first time you heard that? A. Soon after I went there. . Q. You mean by that, soon after you were ten years old, when you went there? . A. Well, all the time he would say that. Q. And how late down before he died, did you hear that discussed? . . . A. I was not there when he went away. Q. In the conversation about the provision for Manlius, tell the jury if anything was said about what he was paying him? A. He paid him $15.00 per month at first and paid him $20.00. Q. Now before that question, if you heard Mr. Staiar and Manlius together talk that

matter over, or if Mr. Staiar talked to you and told you anything about it, tell the jury? A. He said he knew $20.00 was not enough, but he had everything fixed for him and he would never want for anything if he stayed as long as they lived. Q. Did he say how it was fixed? A. Said he would leave him a home and money to take care of him. Q. Tell whether those old people, through you, made these facts known to the daughter? A. Yes, sir. Q. Tell the court and jury how that came about and how you know, tell the facts? A. I wrote letters for them and he told me what to write. He said, 'Tell Kate I said Manlius had stayed with us and if anything should happen, to see that he has a home and enough to live on,' and I wrote that to them and sent it special delivery. Q. Was that letter stamped and sent to her at her address? . . . A. Yes, sir. Q. Tell whether or not any reference was made in any other letters about the provision for Manlius? A. Every time I would write she would write back and tell them she would never let Manlius want for anything. Q. In any letters they directed you to write, would they make it known to their daughter, the provision they had made for Manlius? A. I wrote several times, and he would say, 'Tell Kate everything is fixed.' Q. For who? A. For Manlius, and for you. . . . Q. In that case, tell the court and jury whether or not you and T. W. Staiar, or whether he talked in your presence, anything about the will? A. Well, he has. Q. What did he say? A. He said he wanted things fixed so there would be no misunderstanding when he was gone, and when Mary was gone, and I came and got a lawyer and whether he wrote the will or not I don't know; I got lawyer Botts. Q. Did you do that at his request? A. Yes, sir. . . . Q. What did Staiar say? A. He said 'Manlius, you stay, everything is fixed for you, I know it is not enough,' and February he didn't pay him that.''

Another witness named Louise Harris testified in part as follows:

''Q. Tell in your own way what you heard Mr. Staiar say to Manlius and Manlius say to Mr. Staiar? A. People would want my grandfather to work for them. Manlius would go and tell Mr. Staiar that so and so, whoever it was, wanted him to work for him, and Mr. Staiar would say, 'Manlius, I don't want you to do work for outsiders. first and last you will be gone and I don't want you to go,' and he would say, 'I know I ain't paying you enough for

what you are doing, but I have told you before if you would stay with me and stick to me I would give you a home and enough to live on when I die.' . . . Q. About how often did you hear conversations like that you have just detailed? A. About a dozen times. Q. What, if anything, have you heard Manlius say to Mr. Staiar when talking about paying him? A. 'That's all right, boss; you told me before how you was going to give me a home and enough to live on and I'm going to stay with you.' Q. What was said by old man Staiar and Manlius? A. I told Mr. Staiar Mrs. Staiar was dead, and he said, 'Where is Manlius?' I said 'He is out in the yard some place.' And he said, 'Call him.' I went out and called him and he said, 'Manlius, Lou says Mary is dead and I am depending upon you to stay with me and do for me.' He says, 'If you stay with me as long as I live I am going to give you a home and enough to live on.' He says, 'You shall be rewarded for what you do.' "

Other witnesses testified in substance the same.

For appellant, administrator of Staiar, it is insisted that this evidence is too vague and uncertain to support the averments of the petition; that appellee was bound under the law to prove an express contract by clear and convincing evidence; that the evidence offered was not clear and convincing, and appellant's motion for a directed verdict in his favor should have been sustained. It is further stated by appellant that the property agreed to be willed or deeded was not specifically identified, or any basis fixed for ascertaining either the property or the value thereof, and for this reason the contract was too indefinite and vague for enforcement in a court of equity. A further complaint is that the instructions to the jury were erroneous because indefinite and vague. He also says the verdict was excessive and that it was arrived at upon erroneous and incompetent evidence.

From a careful examination of the evidence introduced for appellee Netter, we are constrained to believe that the case was properly allowed to go to the jury. The evidence given by the servants about the place as to what was said by the deceased Staiar to Manlius and the agreement made between them was entirely competent. While this testimony is vague in some parts it is sufficiently definite and certain in the main not only to carry the case to the jury but to support the verdict; for, as claimed by appellee, the deceased Staiar was paying him only $20.00 per month and requiring him not only to

wait upon him in his sickness but also to serve Mrs. Staiar in like manner and to act as coachman, and gardener and man of all work, both day and night. Upon Manlius' intimation that he intended to withdraw from his employment and take other employment, Staiar agreed to and promised Manlius that if he would continue his services to him and wife so long as they lived Staiar would give him a house and lot and sufficient money to support him the balance of his days. We know of no reason why such a contract may not be enforced if the house and lot be sufficiently identified or designated to enable the court to pronounce judgment, which is doubtful in this case. At least the balance of the contract by which Staiar was to give Manlius money sufficient to keep him comfortable the remainder of Manlius' life is enforceable even though the description of the house and lot be too general and indefinite to allow of enforcement. We are inclined to the belief owing to the indefiniteness of the evidence, that the trial court erred in submitting the question of the house and lot to the jury. The only evidence given on appellee's behalf on that subject was perhaps too general and indefinite to enable the court to know for a certainty which house and lot, if any in fact, was intended. Without such facts it would be utterly impossible for the court to adjudge its value or to decree specific performance, if such were sought. It follows therefore that as Manlius was not entitled upon the evidence introduced to have a recovery for the value of the house and lot, which some of the witnesses say Staiar promised to give him, it was error for the trial court to submit that question to the jury.

Appellee was entitled to prove his services, but not the value thereof, to prove the contract and his performance thereof according to its terms, by serving appellants' intestate throughout his days, and to prove appellee's age and existing situation in life, and the sum which would be reasonably sufficient to maintain him in said situation for the balance of his life, reckoned according to the recognized tables of mortality. Such a sum is ascertainable. If the jury from the evidence should conclude that Staiar and appellee entered into the contract relied upon by appellee, it remains for it to determine from the evidence offered for Manlius of his age and expectancy to find the sum which would reasonably support and maintain Manlius in his situation of life for the number of years of his expectancy, according to recognized

tables of mortality. This may be or may not be a sum as great or greater than $3,500.00 for which he prays.

Upon a retrial of the case the court below will instruct the jury in substance the same as that given as No. 2 on the last trial, with the exception that it will omit from said instruction that part which reads: "And you should find for plaintiff against defendant, Kate Rousseau, such sum as you may believe from the evidence is the reasonable value of the services rendered by plaintiff to said Staiar after the making of said contract, if any contract was made, and not paid for by Staiar or his estate, not exceeding the sum of $3,500.00;" and in lieu thereof the court will say: "And you will find for plaintiff against defendant, Kate Rousseau, such sum as you may believe from the evidence will be reasonably sufficient to maintain Manlius Netter in his station for the balance of his natural life based upon his expectancy as shown by the mortality tables, not to exceed the sum for which the plaintiff has sued," setting it forth.

The jury should be told that it can find nothing for Netter on account of the alleged contract between him and Staiar by which Staiar was to give him a house and lot, if the evidence is in substance the same as upon the last trial.

For the reasons indicated the judgment is reversed for new trial not inconsistent with this opinion.

Judgment reversed.